ROBERT WIEMER, MD                       PLAINTIFF

v.                          CAUSE NO. 1:16CV99-LG-RHW

DENISE RUBINO and JON DOE 1-5           DEFENDANT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE came before the Court for a hearing on damages to be awarded in favor of Counter-Claimant Denise Rubino and against Counter-Defendant Robert Wiemer. Weimer initiated the case as a "Complaint for Permanent Restraining Order and Other Relief" against Dr. Rubino seeking return of items allegedly taken by Dr. Rubino when their medical practice business relationship disintegrated. Dr. Rubino brought multiple counterclaims. After finding that Wiemer had willfully failed to comply with his discovery obligations, the Court ordered default judgment in favor of Dr. Rubino in regard to her counterclaims against Wiemer as a sanction under Federal Rule of Civil Procedure 37(e)(2). Thereafter, the Court conducted a hearing on damages, at which both parties appeared and testified. After consideration of the pleadings, arguments of counsel, testimony at the hearing, and the relevant law, the Court assesses damages and enters a default judgment in favor of Dr. Rubino and against Dr. Wiemer.

## I. THE LEGAL STANDARD

"After a default judgment, the plaintiff's well-pleaded factual allegations are taken as true, except regarding damages . . . [and] personal jurisdiction." *Jackson*

*v. FIE Corp.*, 302 F.3d 515, 525 (5th Cir. 2002) (citations omitted). A defendant "may not challenge the sufficiency of the evidence" in the wake of a default judgment. *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496 (5th Cir. 2015). But while a default judgment conclusively establishes a defendant's liability, such liability exists "only so far as it is supported by well-pleaded allegations." *Leedo Cabinetry v. James Sales & Distribution, Inc.*, 157 F.3d 410, 414 (5th Cir. 1998); *Wooten*, 788 F.3d at 496. Therefore, the Court must apply the Federal Rule of Civil Procedure 12(b)(6) standard to each claim to determine if there can be liability under that claim. *Wooten*, 788 F.3d at 500. Under Rule 12(b)(6), the Court must determine whether Henry's Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) ("To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' ") (quoting *Twombly*, 550 U.S. at 555).

The Court previously affirmed its subject-matter jurisdiction in the [15] Memorandum Opinion and Order Denying Motion to Remand, and Dr. Wiemer's Mississippi residence gives this Court personal jurisdiction over him. Accordingly,

- 2 -

the only remaining question is the damages available for each well-pleaded claim.

## II.   FACTS ALLEGED[1]

In her [49] First Amended Answer, Affirmative Defenses and Counterclaim, Dr. Rubino alleges an elaborate scheme devised by Wiemer to defraud her out of hundreds of thousands of dollars and personal property in order to fund his own personal and professional endeavors.

In the early 2000s, Dr. Wiemer and Dr. Rubino met and eventually became romantically involved.   Throughout their relationship, Dr. Wiemer consistently told Dr. Rubino that they would be married, and, in fact, often called Dr. Rubino his "wife" throughout their relationship.

On or about November 11, 2009, Dr. Wiemer filed a voluntary petition for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Eastern District of California (Petition No. 09-44733).   During the time of Dr. Wiemer's original Bankruptcy proceeding, Dr. Rubino supported Dr. Wiemer financially in his professional and personal activities based on his continued and consistent promise that all investments would be shared by Dr. Wiemer and Dr. Rubino equally.

Prior to and during Dr. Wiemer's Bankruptcy proceeding he owned two properties: a parcel located at 4490 North Lake Blvd., Carnelian Bay, CA 96140 ("Tahoe Property") and a parcel located at 4732 Illinois Ave., Fair Oaks, California

---

[1]   These facts are taken primarily from the First Amended Answer, supplemented with details obtained during the hearing.

95628 ("Fair Oaks Property").   During the time of his Bankruptcy, Dr. Wiemer

promised Dr. Rubino that he would put her name on the title of these properties, if

she would pay the maintenance, utilities and taxes on them.   She paid   expenses

totaling $17,009.96.

In addition to paying the maintenance, utilities and taxes, Dr. Rubino

furnished both homes, and stored both clothes and personal property in the Tahoe

Property, the Fair Oaks Property and in various places on the Mississippi Gulf

Coast.   Dr. Wiemer has Dr. Rubino's personal property in his possession and

control.   Dr. Wiemer has refused to pay for, return, or allow Dr. Rubino to collect

her personal personal property.   The total value of the personal property for which

Dr. Rubino seeks a monetary award is $214,840.00.

On or about June of 2012, Dr. Rubino provided $50,000.00 to Wiemer on his

promise that all properties obtained with said monies would be owned equally by

Dr. Rubino and Dr. Wiemer.   Dr. Wiemer used the $50,000.00 to pay the

Bankruptcy Court for the privilege of keeping in his possession certain personal

property.   Dr. Wiemer never intended that Dr. Rubino would be an equal owner as

to any personal property purchased with the $50,000.00.

On or about June 2, 2011, Dr. Wiemer persuaded Dr. Rubino to become one of

two initial members of Live Oak Beauvoir, LLC.   Dr. Wiemer and Dr. Rubino were

equal members, each owning fifty percent of the LLC.   Live Oak Beauvoir, LLC

was created in order to purchase several parcels of land. Those parcels included

Lots 2, 4, and 6 of Lafitte Estates, Lot 28 located at 128 Lafitte Drive, and 305 N. Beach Blvd, Waveland, MS (the "Waveland Properties"). The parcels were purchased through the recently created Live Oak Beauvoir, LLC. Dr. Wiemer informed Dr. Rubino that in order to obtain the Waveland Properties, she would need to make an initial payment of $152,746.91 to the LLC. Dr. Rubino made this payment from her own separate funds. Dr. Wiemer promised Dr. Rubino that he would make an equal payment of $150,000.00 in July of 2014 in order to provide his equal share to the LLC.

In order to obtain the Waveland Properties, Dr. Wiemer and Dr. Rubino each signed a Note in favor of private lenders, Frederick L. and Lavina A. Tomlinson (the "Tomlinson Note"). This was done at the request of Dr. Wiemer. The Tomlinson Note required a balloon payment of $150,000.00 on July 1, 2014. Dr. Wiemer promised Dr. Rubino that he would make that payment. Dr. Wiemer did not pay the balloon payment of $150,000.00 on July 1, 2014 and never informed Dr. Rubino that he failed to make the payment. Dr. Wiemer never intended to make the balloon payment required by the Tomlinson Note and hid the fact that he had failed to make such a payment from Dr. Rubino.

Due to the fact the Dr. Wiemer never informed Dr. Rubino of his failure to make the balloon payment, Dr. Rubino continued to pay the $8,129.54 monthly payment. Dr. Rubino contributed a total of $195,108.98 in monthly payments. Dr. Rubino learned that despite Dr. Wiemer's assertion that the Waveland

Properties had been appraised, no appraisal had ever been completed. Dr. Wiemer never intended to make any payments toward the Tomlinson Note, nor did he ever intend to maintain Live Oak Beauvoir, LLC because Dr. Wiemer never intended to share any portion of the business or Waveland properties with Dr. Rubino.

Dr. Wiemer and Dr. Rubino formed another LLC on or about November 1, 2013 – Georgia Peach Properties, LLC – in which they were equal partners. Dr. Wiemer asked Dr. Rubino to make the initial investment payment to Georgia Peach Properties, LLC in order to obtain certain properties. At this time, Dr. Rubino declined and stated that she would only agree if Dr. Wiemer paid an equal share of the initial investment. Dr. Wiemer agreed to Dr. Rubino's request, but unbeknownst to her, took funds from another jointly and equally owned business in order to provide his portion of the payment rather than take it from his own separate funds as Dr. Rubino had done. Dr. Wiemer purposefully hid the source of his funds in order to make Dr. Rubino believe he was contributing an equal share.

On or about November 27, 2013, Georgia Peach Properties, LLC acquired a parcel of land located at 138 Lafitte Dr. Waveland, MS 39576 for a total amount of $15,552.26. On or about February 27, 2014, Georgia Peach Properties, LLC acquired a parcel of land located at 136 Lafitte Dr. Waveland, MS 39576 for a total amount of $12,545.75.

As Dr. Wiemer's Bankruptcy was coming to a close, he suggested to Dr.

Rubino that they move to Mississippi or Louisiana where they could open their own medical practice. Dr. Wiemer promised that any medical practice would be an equal partnership. Dr. Wiemer never intended for Dr. Rubino to be an equal partner in a medical practice but made such promises so that Dr. Rubino would fund the initial costs and other certain costs of maintaining a medical practice. Dr. Wiemer and Dr. Rubino were to be equal partners in Gulf Coast Live Oak Functional Medicine Institute, LLC and Gulf Functional Medicine Institute, LLC (collectively, the "Medical Practice"). Dr. Rubino made all initial investments to set up the medical practice, including but not limited to attorney's fees, rental payments for leased business space, and the purchase of furniture and medical equipment. Dr. Wiemer over-medicated Dr. Rubino during this time in order to diminish her capacity to question any business dealings.

Dr. Wiemer promised Dr. Rubino that he would manage the Medical Practice and share with her the profits of such Medical Practice as an equal partner. Dr. Wiemer never intended to share the profits of the Medical Practice. Dr. Wiemer stole and/or misappropriated $1,026,317.62 (inclusive of 8% prejudgment interest compounded annually) from the Medical Practice for his own personal use. Dr. Wiemer was not entitled to this money.

By March of 2015, Dr. Rubino moved back to California in order to care for her own medical issues. Dr. Wiemer promised that he would manage the Medical Practice in her absence and maintain the equal partnership. Dr. Wiemer started a

new company without Dr. Rubino in order to maintain the Medical Practice to her exclusion. Dr. Wiemer's new company has all the same patients and employees as the previously shared Medical Practice. Dr. Wiemer has converted all furniture, medical equipment and office supplies previously used by the Medical Practice for use in his new separately owned medical practice. It was always Dr. Wiemer's intention to have his own medical practice separate and apart from Dr. Rubino. Dr. Wiemer knew his promises to maintain the practice as an equal partnership and manage it accordingly were false.

Throughout 2011, 2012, 2013, 2014 and some of 2015, Dr. Wiemer and Dr. Rubino used jointly earned funds to purchase rare coins, silver, and precious jewelry as investments to share equally. Dr. Wiemer has hidden these items in order to convert them to his own personal property and for his own personal use. Dr. Rubino also purchased a Kubota Tractor and implements for Live Oak Beauvoir, LLC, all of which has been wrongfully retained and converted by Dr. Weimer.

### III. ANALYSIS OF THE ALLEGATIONS

**Fraud**

Rule 9(b) of the Federal Rules of Civil Procedure requires that, in all averments of fraud, the circumstances constituting fraud must be stated with particularity. "Pleading fraud with particularity in this circuit requires time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Williams*

*v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (citations and quotation marks omitted). The Fifth Circuit "interprets Rule 9(b) strictly, requiring the plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (internal quotation marks omitted).

a. *Live Oak Beauvoir LLC*

Dr. Rubino's fraud allegations in regard to the Live Oak Beauvoir LLC are not completely clear. She seems to allege that Dr. Wiemer promised her that after she paid $150,000 to the LLC in order to purchase properties, he would pay an equal amount to the LLC in July of 2014, also to go toward purchase of the properties. (Am. Counterclaim 21, ECF No. 49.) Meanwhile, joint funds were used to make the $8129.54 monthly payments on a Note signed by both doctors. Dr. Rubino alleges that Dr. Wiemer failed to make his promised $150,000 contribution in July 2014, which appears to have been earmarked for a balloon payment due on the Note. Dr. Rubino alleges that she discovered that Dr. Wiemer had not made his promised $150,000 payment only when the Note maker informed her one year later. (*Id*. at 22.) Dr. Rubino alleges that the properties purchased through the Live Oak LLC have been foreclosed upon and Dr. Wiemer allowed the LLC to be administratively dissolved. She seeks return of her initial $150,000 investment in the LLC and the value of her half of the funds used to make the

monthly payments, a total of $336,979.42.

The Court finds these allegations insufficient under Fed. R. Civ. P. 9(b) to state a claim of fraud against Dr. Wiemer in regard to the Live Oak Beauvoir LLC. Time and place allegations are missing, as is any allegation of what Dr. Wiemer obtained by making the alleged false representations. The properties and the LLC have been lost to Dr. Wiemer just as they have been to Dr. Rubino. Accordingly, this claim of fraud fails.

     *b.*   *Georgia Peach Properties, LLC*

Dr. Rubino's fraud allegations in regard to the Georgia Peach LLC are that when the LLC was formed, Dr. Wiemer promised to pay an equal share of the initial investment. Dr. Rubino alleges that Dr. Wiemer did not contribute an equal share because he used funds from a business he jointly owned with Dr. Rubino. Dr. Rubino alleges that she therefore has a seventy-five percent interest in the two properties purchased by the LLC, with a monetary value of $21,073.51. (Am. Counterclaim 24, ECF No. 49.) Dr. Rubino further alleges that at some point Dr. Wiemer titled the two properties in his own name only, and allowed Georgia Peach LLC to be administratively dissolved. Dr. Rubino seeks an award of sole ownership of the properties. The Court finds these allegations insufficient under Fed. R. Civ. P. 9(b) to state a claim of fraud against Dr. Wiemer in regard to the Georgia Peach LLC, because they fail to establish when or where Dr. Wiemer made his alleged false promise. This fraud claim also fails.

**Conversion**

"Conversion requires an intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987). "Ownership of the property is an essential element of a claim for conversion." *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 68 (Miss. 2004). Conversion applies only to personal property, not real property. *Hopson v. Specialized Loan Servicing, LLC,* No. 3:17cv832-DPJ-FKB, 2018 WL 2449180, *5 (S.D. Miss. May 29, 2018).

Normally, a claim of conversion cannot be brought to recover money. A cause of action exists for conversion of money only when money is earmarked or otherwise identifiable, such as enclosed in a container like a bag or chest. *Hensley v. Poole*, 910 So. 2d 96, 101 (Ala. 2005); *Blades v. Countrywide Home Loans, Inc.*, No. 1:06cv1000-LG-JMR, 2007 WL 2746678, at *4 (S.D. Miss. Sep. 18, 2007). Dr. Rubino specifies physical property that she alleges she owns but Wiemer is exerting dominion over, such as furniture, household items, and medical practice items. She therefore adequately alleges a conversion claim.

**Breach of Fiduciary Duty**

In order to state a claim for breach of fiduciary duty, the plaintiff must allege a factual basis for such a duty. *Lowery v. Guaranty Bank & Trust Co.*, 592 So.2d 79, 83 (Miss.1991) (stating that a duty must exist before a breach of fiduciary duty

can occur).   Dr. Rubino's claims for fraudulent and negligent omissions are likewise dependent on the existence of a fiduciary or other confidential relationship.   *Strong v. First Family Fin. Servs., Inc.*, 202 F. Supp. 2d 536, 540 (S.D. Miss. 2002). "[S]ince silence, in the absence of a duty to speak, is not actionable, plaintiffs' claims for misrepresentation by omission are dependent on the existence of a duty of disclosure, which would arise if a fiduciary relationship existed."   *Id.* (citing *Chiarella v. U.S.*, 445 U.S. 222, 228 (1980) ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so."))

Dr. Rubino alleges two fiduciary relationships between herself and Wiemer; as equal members of an LLC, and as doctor/patient, when Dr. Rubino was under Wiemer's medical care.

One of the "typical" fiduciary relationships under Mississippi law is that of doctor-patient.   *Woodkrest Custom Homes Inc. v. Cooper*, 108 So. 3d 460, 467 (Miss. Ct. App. 2013).   Dr. Rubino alleges that during 2011, she was not yet licensed to practice medicine and recovering from an injury under Wiemer's care.   (Answer & Counterclaim 25, ECF No. 49.)   She alleges that Wiemer over-medicated her in order to diminish her capacity to question any business dealings.   (*Id.*)   These allegations establish a fiduciary relationship and a breach thereof.

Dr. Rubino also alleges that Wiemer mismanaged the LLCs and allowed them to be administratively dissolved without notifying her.   Mississippi law allows one

LLC member to bring a claim against another member for breach of fiduciary duties. *See, e.g., KD Hattiesburg 1128, Inc. v. Turtle Creek Crossing, LLC, 237 So. 3d 157, 163 (Miss. 2018)*; *Bros. v. Winstead*, 129 So. 3d 906, 923-24 (Miss. 2014) (recognizing an LLC member had an individual claim for legal damages for the breach of fiduciary duties owed him separate from a claim of breach of fiduciary duties owed to the company). However, Dr. Rubino may not bring a claim that concerns Dr. Wiemer's breach of fiduciary duty owed to the LLCs, only an individual claim for Dr. Wiemer's intentional breach of the duty owed directly to Dr. Rubino that caused her personal damages, separate and apart from any damages to the LLCs. *Bros.*, 129 So. 3d at 923. "[A] claim that [the defendant] breached his fiduciary duty through mismanagement or dissipation of corporate assets belongs to the corporation because the wrong necessarily damages the corporation and damages [the plaintiff] only derivatively." *Id.* at 923-24. Thus, Dr. Rubino's claims that Dr. Wiemer 1) allowed the LLCs to lapse, and 2) transferred property owned by the Georgia Peach LLC to himself, thereby breaching a fiduciary duty to her, are not viable under Mississippi law. Dr. Rubino's allegations do not establish a breach of the fiduciary duty owed by one LLC member to another.

**Intentional Infliction of Emotional Distress**

The elements of an intentional infliction of emotional distress claim are extreme and outrageous conduct going beyond all possible bounds of decency. *See Brown v. Inter-City Fed. Bank for Sav.*, 738 So. 2d 262, 264 (Miss. Ct. App. 1999).

Liability does not extend to "mere insults, indignities, threats, annoyances, or petty oppressions." *Raiola v. Chevron U.S.A. Inc.*, 872 So. 2d 79, 85 (Miss. Ct. App. 2004).

Dr. Rubino's allegations may be sufficient to state an intentional infliction of emotional distress when the holding of *Swarzfager v. Saul*, 213 So. 3d 55 (Miss. 2017) is considered. In that case, the defendant's actions concerning a land sale/swap scheme were described as "'self-serving greed from start to finish' – something akin to 'a portrait of egregious behavior.'" *Id.* at 67. The acts "were clearly and intentionally made in self-serving bad faith . . . with total disregard for the welfare of [the plaintiffs]." *Id.* The court found "support for the chancellor's finding that [the defendant's] behavior was repetitive and egregious, resulting in the disruption of [the plaintiffs'] lives, with the sole result being [the defendant's] financial benefit. [The plaintiffs'] emotional distress clearly was a foreseeable result of [the defendant] repeatedly breaking his promises." *Id.*

The *Swarzfager* court's statements are similar to Dr. Rubino's allegations describing Wiemer's actions – repeatedly lying to her in order to financially benefit himself. For this reason, Dr. Rubinos's allegations supporting the intentional infliction of emotional distress claim meet the Rule 8 standard.

**Negligent Misrepresentation**

To establish a claim of negligent misrepresentation, the party asserting the claim must prove, by a preponderance of the evidence, the following elements;

(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct or proximate result of such reasonable reliance. *Elchos v. Haas*, 178 So. 3d 1183, 1197 (Miss. 2015) (citing *Holland v. Peoples Bank & Trust*, 3 So. 3d 94, 101 (Miss. 2008)).

For purposes of this claim, "a mere promise to perform an act in the future is not, in a legal sense, a representation, and [ ] a mere failure to perform it does not change its character." *Credit Indus. Co. v. Adams Cty. Lumber & Supply Co.*, 60 So. 2d 790, 794 (1952). There are no allegations that Wiemer made representations that "relate[d] to past or presently existing facts, as facts." *Bank of Shaw, a Branch of Grenada Bank v. Posey*, 573 So. 2d 1355, 1360 (Miss. 1990). Dr. Rubino's allegations concern Dr. Wiemer's promises of future conduct, which means that her allegations do not establish the first element of a negligent misrepresentation claim. Further, Dr. Rubino does not allege what degree of diligence and expertise she could have expected Dr. Wiemer to exercise, or why she could reasonably rely on his statements or omissions. Accordingly, this claim does not meet the Rule 8 standard.

**Negligence**

To recover for negligence, a plaintiff must prove each of the elements of a

negligence claim: (1) duty, (2) breach of duty, (3) causation, and (4) damages. *Banks v. Brinker Miss., Inc.*, 146 So. 3d 388, 391 (Miss. Ct. App. 2014). Dr. Rubino alleges that Dr. Wiemer was under a duty to act reasonably and prudently toward her and refrain from damaging her, which duty he breached in the multiple ways she set out earlier. Although the allegations largely describe intentional conduct, there are some instances where Dr. Wiemer's actions might constitute negligence instead, such as allowing the LLCs to lapse. Dr. Rubino alleges that she lost ownership in properties when the LLCs lapsed and were dissolved. Accordingly, the Court finds Dr. Rubino's allegations sufficient to state a negligence claim.

**Breach of Contract**

It is basic contract law that a "formation of a contract, either oral or written, requires (1) an offer, (2) acceptance of the offer, and (3) consideration." *Fried Alligator Films, LLC v. New York Life Ins. Co.*, No. 4:16-CV-175-DMB-JMV, 2017 WL 4355825, at *5 (N.D. Miss. Sept. 29, 2017). Dr. Rubino alleges a number of instances where Wiemer made a promise that in exchange for Dr. Rubino's money, she would receive something in return, such as real property titled in her name or equal ownership of personal property. Dr. Rubino alleges she performed her part of these bargains, but Wiemer never performed his.

To the extent that any of Dr. Wiemer's promises to Dr. Rubino concern the transfer of title to real property, these alleged oral contracts fail as a matter of law. Mississippi requires that contracts involving the transfer of real property be in

writing. *Barriffe v. Estate of Nelson*, 153 So. 3d 613, 621 (Miss. 2014) ("The Barriffes claim they had an oral agreement with Lawson that they could make improvements on his land and that he would transfer the land to them. This alleged contract fails under the statute of frauds."). There is no allegation or testimony indicating that any promise at issue in this case was written down.

Dr. Wiemer pled the affirmative defense of statute of frauds in his answer to Dr. Rubino's counterclaims, and it would normally be Dr. Wiemer's burden to prove an affirmative defense. See *Hugh Symons Grp., PLC v. Motorola, Inc.*, 292 F.3d 466, 469-70 (5th Cir. 2002). However, "[i]f, based on the facts pleaded and judicially noticed, a successful affirmative defense appears, then dismissal under Rule 12(b)(6) is proper." *Hall v. Hodgkins*, 305 F. App'x 224, 227-28 (5th Cir. 2008) (citing *Kansa Reins. Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994)); *see also Johnson-Williams v. Citimortgage, Inc.*, No. 18-10365, 2018 WL 4523159, at *2 (5th Cir. Sept. 20, 2018); *Guajardo v. JP Morgan Chase Bank, N.A.*, 605 F. App'x 240, 248-49 (5th Cir. 2015). Dr. Rubino did not alternatively plead equitable estoppel, which, if successful, could overcome a statute of frauds defense. *See Swartzfager v. Saul*, 213 So. 3d 55, 64-65 (Miss. 2017).

For these reasons, the Court concludes that Mississippi's statute of frauds bars Dr. Rubino's breach of contract claims involving a promise to transfer real property. But to the extent that Dr. Rubino's allegations concern a promise to convey equal ownership of personal property, she has sufficiently stated a breach of

contract claim.

**Unjust Enrichment**

Dr. Rubino has alleged this claim in the alternative, since the doctrine of
"[u]njust enrichment only applies to situations where there is no legal contract and
'the person sought to be charged is in possession of money or property which in good
conscience and justice he should not retain but should deliver to another.'" *Miss.
Dep't of Envtl. Quality v. Pac. Chlorine, Inc.*, 100 So. 3d 432, 442 (Miss. 2012). If
there is a legally binding contract alleged, then Dr. Rubino cannot also state a claim
for unjust enrichment. *See Jordan v. Nationwide Tr. Servs., Inc.*, No. 3:14-cv-503,
2014 WL 6982641, at *5 (S.D. Miss. Dec. 9, 2014). Because Dr. Rubino has
adequately alleged legally binding oral contracts as to equal ownership of personal
property, she cannot also allege an unjust enrichment claim concerning the same
promises. However, there is no legal contract in those instances because the
statute of frauds bars enforcement of the promises concerning transfer of real
property.

Dr. Rubino alleges that when the Live Oak Beauvoir, LLC made a purchase
of properties, "Wiemer overvalued the Waveland properties in order to avoid
obtaining a loan so that Rubino's name would not be on [the] title to the Waveland
Properties." (Ans. & Counterclaims 22, ECF No. 49.) According to Dr. Rubino,
Dr. Wiemer used private lenders to carry out this subterfuge, because they did not
require an appraisal (something Dr. Wiemer allegedly told Dr. Rubino had been

done).   As a result, the note on the properties was for much more than the properties were worth.   Dr. Rubino alleges the properties have now been lost to foreclosure.

Similarly, when the Georgia Peach Properties, LLC was formed, Dr. Wiemer allegedly secretly used funds belonging to another business owned jointly by himself and Dr. Rubino to pay his half of the initial investment, rather than using his own funds as Dr. Rubino did.   (Ans. & Counterclaims 23, ECF No. 49).   Dr. Rubino alleges she is now not on the title to the properties purchased by the LLC, even though she owns seventy-five percent of them by virtue of Dr. Wiemer's actions.

It is clear that Dr. Rubino alleges that the real property at issue is, or should be, owned by the LLCs.   If, as Dr. Rubino alleges, Dr. Wiemer has wrongfully transferred LLC property to himself, it is the LLC that is entitled to "delivery" of it, not the individual members.[2]   As individuals, Dr. Rubino may not obtain "delivery" of LLC property, and Dr. Wiemer does not have "possession" of LLC property. Accordingly, Dr. Rubino's unjust enrichment claim does not meet the Rule 8 standard.

**Breach of the Covenant of Good Faith and Fair Dealing**

The covenant of good faith and fair dealing holds that neither party will do anything which injures the right of the other to receive the benefits of the

---

[2] Dr. Rubino alleges the LLCs have been administratively dissolved, but they continue in legal existence despite dissolution.   *See* Miss. Code Ann. § 79-29-831.

agreement.  *Ferrara v. Walters*, 919 So. 2d 876, 883 (Miss. 2005).   It is implied in

all contracts.   "Good faith is the faithfulness of an agreed purpose between two

parties, a purpose which is consistent with justified expectations of the other party.

The breach of good faith is bad faith characterized by some conduct which violates

standards of decency, fairness or reasonableness."  *Cenac v. Murry*, 609 So. 2d

1257, 1272 (Miss. 1992).   "Stated differently, '[t]he covenant holds that neither

party will do anything which injures the right of the other to receive the benefits of

the agreement.'"  *Ferrara v. Walters*, 919 So.2d 876, 883 (Miss. 2005) (internal

quotation mark omitted).    "Some conduct, such as subterfuge and evasion, clearly

violates the duty."  *Jones v. Miss. Insts. of Higher Learning*, No.

2016-CA-01050-COA, 2018 WL 3853409, at *6 (Miss. Ct. App. Aug. 14, 2018).

Dr. Rubino makes some allegations meeting this standard in regard to the

enforceable contracts concerning personal property.   For example, she alleges that

Dr. Wiemer promised her equal ownership of whatever property Dr. Wiemer

purchased with the $50,000 she lent him, while never intending to follow through

with his promise.   She also alleges that Dr. Wiemer induced her to pay the startup

and maintenance costs of the medical practice with promises to equally share the

profits, but did not intend to fulfill these promises.   These allegations, showing that

Wiemer's actions denied Dr. Rubino the benefits of the contracts, are sufficient to

state a claim for breach of the covenant of good faith and fair dealing.

**Bad Faith Breach of Contract**

"Although styled a tort, an action for bad-faith breach of contract is created by contract and requires proof of a breach of contract." *Birdsong v. Lincoln Nat. Life Ins. Co.*, No. 3:10CV699-DPJ-FKB, 2012 WL 5026437, at *6 (S.D. Miss. Oct. 17, 2012). Because there are allegations showing breach of contract and breach of the duty of good faith, it follows that the allegations are sufficient to state a claim of bad faith breach of contract.

## IV.   DAMAGES

Dr. Wiemer is liable to Dr. Rubino for those claims that the Court has found to be well-pleaded above. Dr. Rubio is entitled to recover damages on each of the well-pleaded claims, although she "cannot recover the same damages twice, even though the recovery is based on two separate theories."

Through her counterclaims, Dr. Rubino seeks (1) the value of her personal property converted by Dr. Weimer; (2) the value of money loaned and never repaid; (3) the value of real estate investments; (4) the value of money invested in business entities and lost due to Dr. Weimer's acts and omissions; (5) the value of money stolen by Dr. Weimer from business entities jointly owned by Dr. Rubino and Dr. Weimer; (6) the value of money Dr. Rubino is entitled to receive from the medical practice, but never received; (7) the value of non-economic damages for emotional distress and mental anguish; (8) an adjudication of Dr. Rubino's sole ownership of certain personal and real property; (9) her one-half interest in the current value of

the medical practice; (10) punitive damages; (11) interest, (12) attorney's fees and (13) costs.

**Personal Property in Dr. Rubino's Possession**

The parties agree that Dr. Rubino is entitled to sole possession of the personal property in a storage locker in Long Beach, Mississippi. Accordingly, the Court awards Dr. Rubino sole possession of the items in the inventory listed in Exhibit 3 to her Affidavit in Support of Damages. (ECF No. 196-4.)

**The Value of Personal Property Converted by Dr. Weimer**

Dr. Rubino seeks the value of personal property owned by her but in Dr. Wiemer's possession. She has provided a list of the specific items, her valuation of each item, and the portion of the value she is seeking from Dr. Wiemer. (Rubino Aff. Ex. A1, ECF No. 196-2.) The total requested is $214,840, plus prejudgment interest of $60,272.92.

Dr. Wiemer objects to the value Dr. Rubino placed on some of the items and contends that the Court should require "receipts, credit card statements, or any document otherwise proving value" rather than relying on Dr. Rubino's statement of value. Dr. Wiemer did not provide any evidence contradicting Dr. Rubino's valuation except in regard to a few items through his testimony at the hearing. During his testimony he valued the camouflage trailers at $400 each rather than $5000; the white Cadillac at $2000 rather than $20,000; and the Toyota 4-Runner at $12,000 rather than $45,000. (*See* Hrg. Tr. 73.)

Because there is no evidence beyond the parties' personal valuations of these items, and Dr. Rubino's list does not describe the items in any meaningful way, the Court relies on the lower value as more credible. Accordingly, the Court adjusts Dr. Rubino's list as follows: line item 13, the "Green Toyota 4-Runner" is reduced to fifty percent of $12,000, or $6000; Line item 14, "White Cadillac" is reduced to fifty percent of $2000, or $1000; and Line item 15 "2 Camouflage trailers" is reduced to fifty percent of $800, or $400. This adjustment reduces Dr. Rubino's damages by $30,100, resulting in a new total of $184,740. The appropriate prejudgment interest award for this amount is $51,828.43.

**The Kubota Tractor and Implements**

Dr. Rubino alleged that she took out a loan for a Kubota tractor and purchased the associated implements, but Dr. Wiemer has kept possession of the tractor. (Hrg. Tr. 28.) Dr. Rubino requests an award of sole ownership of the tractor and implements, which a recent estimate indicated were worth $30,000. She provided the sale documents and two cancelled checks to support her damages claim. The two checks are from her personal account and total $1910.16. (Rubino Aff. Ex. 6, ECF No. 196-7.) The sale documents indicate the sale is to "Live Oak Beauvoir, LLC; Denise Rubino" (*id.* at 1, 2), or just "Live Oak Beauvoir." (*Id.* at 3, 4.) The evidence provided does not adequately support her claim that she is entitled to sole possession of the tractor; thus the Court declines to award sole possession.

**The Value of Money Loaned During Wiemer Bankruptcy and Never Repaid**

Dr. Rubino alleges that she gave Dr. Wiemer $50,000 during his Bankruptcy proceedings on the promise that she would receive equal ownership in all properties obtained with said monies. She alleges that instead he redeemed some personal property worth $18,250 in the Bankruptcy Court and he "never intended that Rubino would be an equal owner as to these items." (Am. Countercl. 20, ECF No. 49.)

There was no testimony concerning the actual ownership of any redeemed personal property at the hearing. Instead, Dr. Rubino testified that the $50,000 was to save the house in Lake Tahoe from foreclosure, apparently in furtherance of Dr. Wiemer's promise to put Dr. Rubino on the deed of that property. She testified that she "paid $50,000 of the mortgage to the Bank of America." (Hrg. Tr. 34.) Her counsel clarified that Dr. Rubino was "not seeking return of any mortgage or rental payments," *id*., nor was she seeking an interest in the title or ownership of the Tahoe property. (*Id*. at 32.) In addition, her spreadsheet of damages lists this item only as "money loaned during Wiemer bankruptcy and never repaid." (Rubino Aff. Ex. A1, ECF No. 196-2.) This testimony leads the Court to conclude that Dr. Rubino has not proven damages in regard to the $50,000 payment to or on behalf of Dr. Wiemer.

**Maintenance and Taxes on California Properties**

Dr. Rubino seeks return of money she spent on maintenance, utilities and

taxes on two homes in California owned by Dr. Wiemer. She alleges Dr. Wiemer promised that if she did so, he would put her on the title of the properties. Dr. Rubino alleges she spent $17,009.96 to maintain the homes, but Dr. Wiemer did not put her on the title to either home. She has supported her claim with cancelled checks representing expenses for the California homes. Dr. Wiemer does not contest the amounts set forth by Dr. Rubino. Accordingly, Dr. Rubino has established her claim for $17,009.96 in maintenance expenses. The appropriate prejudgment interest award is $12,436.04.

## The Value of Real Estate Investments

Because Dr. Rubino has not stated a viable claim that would allow her to obtain damages for the value of the real estate investments, the Court makes no award.

## Withdrawals From the Medical Practice

Dr. Rubino alleges that she "made all initial investments to set up the medical practice, including but not limited to attorney's fees, rental payments for leased business space, and purchase of furniture and medical equipment." (Am Counterclaim 25, ECF No. 49.) Dr. Rubino contends that Dr. Wiemer's withdrawals from the practice's cash balance exceeded the fifty percent he was entitled to under the operating agreement. She seeks $1,026,317.62 in damages, representing Dr. Wiemer's excess cash distributions or withdrawals from the medical practice between 2011 and 2015, plus prejudgment interest.

Under the terms of the operating agreement, the doctors' compensation was "determined as they deem appropriate." (Rubino Aff. Ex. A8, at 6, ECF No. 196-9) (ECF pagination).) At startup, each member was to make a Capital Contribution – a cash or property contribution "in the amount as is deemed necessary and appropriate to provide for the initial operating cost of the Company." (*Id.* at 7.) Distributions of "distributable cash" could be made "at such times and in such amounts as may be determined, in the sole discretion of the Members." (*Id.* at 8.) Distributable cash was to be distributed:

(a)  First, to the Members to the extent of, and in proportion to, their Capital Contributions.

(b)  Then, to the Members to the extent of, and in proportion to, prior cumulative allocations of Taxable Income over cumulative allocations of Tax Losses.

(c)  Then, to the Members in their discretion.

(*Id.* at 9.) The summary of cash distributions shows that both Drs. Rubino and Wiemer received distributions in years 2012 through 2015. (*Id.* at 1-4.) The terms of the operating agreement do not expressly limit Dr. Wiemer to fifty percent of the distributable cash, and there has been no attempt to show that the distributions that occurred did not conform to the operating agreement. Accordingly, the Court finds no medical practice damages due to Dr. Rubino because of Dr. Wiemer's withdrawals.

**The Value of the Medical Practice**

Dr. Rubino seeks a one-half share of the current value of Dr. Wiemer's

medical practice, which she alleged was the same practice she shared in founding.

Neither party presented any expert evidence of the current value of the medical

practice.    Expert testimony would be quite helpful to the Court, given that

businesses are generally valued under either an income, market or asset based

methodology.    *See Dawkins v. Hickman Family Corp.*, No. 1:09-CV-164, 2011 WL

2436537, at *4 (N.D. Miss. June 13, 2011).    Here, the Court has nothing but Dr.

Rubino's testimony that she thought $500,000 was a conservative valuation figure

for the medical practice.    (Hrg. Tr. 30)    Although Mississippi considers expert

valuation testimony to be essential to an equitable division of a business, "findings

on valuation do not require expert testimony," and the Court may rely on the figures

provided by the parties.    *Lacoste v. Lacoste*, 197 So. 3d 897, 908 (Miss. Ct. App.

2016); *see also Benton v. Benton*, 239 So. 3d 545, 549 (Miss. Ct. App. 2018).

Accordingly, the Court finds that the current value of the Gulf Coast Live Oak

Functional Medicine and Gulf Functional Medicine Institute medical practice is

$500,000.    Dr. Rubino is one-half owner of the practice, making the value of her

share $250,000.    She is entitled to an award of this amount.

**Emotional Distress and Mental Anguish**

"Mental anguish is a nebulous concept . . . and requires substantial proof for

recovery."    *Morrison v. Means*, 680 So. 2d 803, 805 (Miss. 1996).

> [T]he standard is whether the defendant's behavior is malicious,
> intentional, willful, wanton, grossly careless, indifferent or reckless.
> If there is outrageous conduct, no injury is required for recovery for
> intentional infliction of emotional distress or mental anguish.    If the

case of ordinary garden variety negligence, the plaintiff must prove some sort of injury, whether it be physical or mental. If the conduct is not malicious, intentional or outrageous, there must be some sort of demonstrative harm, and said harm must have been reasonably foreseeable to the defendant.

*Id.* (internal quotation marks and citations omitted).

When a claim for emotional distress is based on a contract, "a plaintiff must show that (1) the emotional distress was a foreseeable consequence of the particular breach-of-contract and (2) that he or she actually suffered emotional distress; plaintiffs need not prove any physical manifestation." *Swartzfager*, 213 So. 3d at 67. "However, the plaintiff must show specific suffering during a specific time frame; generalizations are not sufficient." *Id.*

In *Strickland v. Rossini*, 589 So. 2d 1268, 1275-76 (Miss. 1991), the Mississippi Supreme Court held that evidence a plaintiff was "very depressed . . . [and] very upset over all this and emotional . . . [and] not able to sleep," was insufficient to recover damages for emotional distress. The supreme court also found insufficient proof of injury to support a claim of emotional distress in *Morrison v. Means*, where a plaintiff testified that the defendant's conduct "affected [him] emotionally in that [he was] not . . . able to sleep many nights because [he] felt like [he had] been done wrong . . . [and] cheated out of money that [he] need[ed] to help support [his] family." *Morrison*, 680 So. 2d at 807.

Under this guidance, Dr. Rubino's testimony is insufficient to support an award of damages for emotional distress. Her testimony in support of her request

for mental anguish and emotional distress damages was:

> It just didn't have to be this way, Judge.   I mean, I didn't deserve this.
> I didn't deserve this pain, this treatment.   I could have easily left and
> we could have split things up.   But to be completely destroyed is
> uncalled for.   I'm just seeking justice.   I actually question my
> confidence in assessing anyone anymore because I trusted him not only
> as a man but as a physician, as a physician to do this to a patient and
> to someone you are treating.   I mean, it is such a betrayal.   It's pretty
> devastating.

(Hrg. Tr. 30.)

Dr. Rubino's testimony is similar to that in *Morrison* and *Strickland*, as her distress is stated wholly in non-specific terms.   "Such generalizations as 'it made me feel bad,' or 'it upset me' are not sufficient."   *Morris Newspaper Corp. v. Allen*, 932 So. 2d 810, 818 (Miss. Ct. App. 2005).   Accordingly, the Court makes no award of damages for emotional distress and mental anguish.

**Punitive Damages**

Mississippi law limits the award of punitive damages to specific circumstances.   *See* Miss. Code Ann. § 11-1-65(1)(a); *Doe ex rel. Doe v. Salvation Army*, 835 So. 2d 76, 79 (Miss. 2003) ("There is no right to punitive damages."). Miss. Code Ann. § 11-1-65(1)(a) provides the criteria for an award of punitive damages:

> Punitive damages may not be awarded if the claimant does not prove
> by clear and convincing evidence that the defendant against whom
> punitive damages are sought acted with actual malice, gross negligence
> which evidences a willful, wanton or reckless disregard for the safety of
> others, or committed actual fraud.

*Id.*

A breach of fiduciary duties has been recognized by the Mississippi Supreme Court as an "extreme or a special additional circumstance" where punitive damages can be allowed. *Ross-King-Walker, Inc. v. Henson*, 672 So. 2d 1188, 1192 (Miss. 1996) (quoting *Fought v. Morris,* 543 So. 2d 167, 173 (Miss. 1989)). Additionally, the facts and circumstances alleged indicate that Dr. Wiemer recklessly disregarded Dr. Rubino's well-being in his financial dealings with her. Therefore, the Court will assess punitive damages in the amount of $2000.

**Attorney Fees and Costs**

Dr. Rubino requests an award of $509,382.24 in attorney's fees. "The award of attorney's fees in a diversity case is governed by state law." *Structural Metals, Inc. v. S & C Elec. Co.*, 590 F. App'x 298, 304 (5th Cir. 2014) (citing *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002)). Under both federal and state law, the Court may not award attorneys' fees to a prevailing party "unless a statute or contract provides" the basis for such an award. *Spear Mktg., Inc. v. BancorpSouth Bank*, 844 F.3d 464, 470 (5th Cir. 2016) (citations omitted). Dr. Rubino acknowledges there is no contractual or statutory basis for an award of attorneys' fees in this case, but notes that Mississippi courts still allow attorneys' fees when punitive damages are warranted. *See Greenlee v. Mitchell*, 607 So. 2d 97, 108 (Miss. 1992) ("When there is no contractual provision or statutory authority providing for attorney fees, they may not be awarded as damages unless punitive damages are also proper.").

Given that the Court has actually awarded punitive damages, Mississippi law allows consideration of the matter of attorneys' fees. Dr. Rubino's counsel entered an affidavit and billing statements supporting the request for attorneys' fees into the hearing record. (Hrg. Ex. D-2.) Dr. Wiemer addressed the request only to argue that it should be entirely denied because punitive damages were not warranted. As the Court found that punitive damages are indeed warranted, consideration of the claim for attorneys' fees should proceed in accordance with Fed. R. Civ. P. 54(d)(2), which requires that a claim for attorneys' fees be made by motion, filed no later than fourteen days after entry of the entry of judgment. Additionally, as the prevailing party in this litigation, Dr. Rubinio is entitled to an award of costs. She may file a Bill of Costs within thirty days of the date of this Order.

## V.   SUMMARY

The well-pled allegations of Dr. Rubino's counter-claims and the evidence adduced at hearing show that Dr. Rubino is entitled to the following default judgment award:

1. Sole possession of the personal property in a storage locker in Long Beach, Mississippi;

2. The value of personal property converted by Dr. Wiemer: $184,740, plus prejudgment interest of $51,828.43;

3. The value of maintenance and expenses on Dr. Wiemer's California properties: $17,009.96, plus prejudgment interest of $12,436.04;

4. The value of one-half of the medical practice: $250,000;

5. Punitive damages in the amount of $2000;

6. Attorneys' fees and costs;

7. Post-judgment interest at the current legal rate.

**IT IS THEREFORE ORDERED AND ADJUDGED** that a final default judgment in favor of Dr. Rubino and against Dr. Wiemer shall enter as set forth above.

**SO ORDERED AND ADJUDGED** this the 14th day of January, 2019.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE